UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
YKIM ANDERSON,

<table>
<tr><td></td><td></td></tr>
</table>

|  |  |
|---|---|
| Petitioner, | **REPORT AND RECOMMENDATION** |
| -against- | 11 Civ. 8240 (NSR)(PED) |
| JOHN LEMPKE, Superintendent,<br>Wende Correctional Facility, |  |
| Respondent.[1] |  |

-------------------------------------------------------X

TO THE HONORABLE NELSON STEPHEN ROMÁN, United States District Judge:

## I. INTRODUCTION

On December 15, 2007, a Dutchess County jury convicted petitioner Ykim Anderson ("petitioner" or "defendant") of the crimes of enterprise corruption (N.Y. Penal Law § 460.20(1)(a)), third degree criminal sale of a firearm (two counts) (N.Y. Penal Law §§ 265.11(1), (2)), second degree burglary (N.Y. Penal Law § 140.25(2)), third degree criminal possession of a controlled substance (two counts) (N.Y. Penal Law § 220.16(1)) and third degree criminal sale of a controlled substance (two counts) (N.Y. Penal Law § 220.39(1)).  He was sentenced on March 20, 2008 to an indeterminate term of imprisonment of six to eighteen years (count 38: enterprise corruption) and determinate terms of imprisonment of four years plus three years post-release supervision ("PRS") (counts 21 and 22: criminal sale firearm), seven years

---

[1] On or about January 15, 2015, petitioner reported he had been transferred to Wende Correctional Facility (Dkt. 27).  The DOCCS inmate locator (nysdoccslookup.doccs.ny.gov) confirms petitioner is currently incarcerated there.  Accordingly, John Lempke, Superintendent of Wende Correctional Facility, is substituted as respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  The Clerk of the Court shall amend the caption to reflect the substitution.

plus five years PRS ("count 23: burglary), four years plus two years PRS (count 30: criminal sale

controlled substance; count 31: criminal possession controlled substance) and eight years plus

two years PRS (count 32: criminal sale controlled substance; count 33 criminal possession

controlled substance). The sentences on counts 21, 23 and 30 are consecutive (resulting in a

determinate sentence of fifteen years); the remaining sentences are concurrent with the

consecutive sentence and with each other.

Presently before this Court is petitioner's *pro se* Petition for a Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2254. This petition is before me pursuant to an Order of Reference

entered December 20, 2011 (Dkt. #7). For the reasons set forth below, I respectfully recommend

that Your Honor deny the petition in its entirety.

## II. <u>BACKGROUND</u>[2]

A. <u>The Crimes</u>

On or about November 13, 2006, petitioner and his five co-defendants (Avery Green,

Dwayne Malcolm, Justin Daniels, Raymond Sharp and David Green, Jr.) were charged in a

Superseding Indictment with 89 crimes stemming from their activities as members of a street

gang known as Partners-N-Crime ("PNC"). According to the Superseding Indictment, PNC's

structure was based on military-style rankings: the captain ("capo"), Avery Green, controlled

the daily workings of the gang; beneath him were the lieutenants, including petitioner, Dwayne

---

[2] Unless otherwise indicated, the information within this section is gleaned from the instant petition (Dkt. #1), respondent's Affidavit in Answer to a Petition for Writ of Habeas Corpus ("Resp. Aff.") (Dkt. #10), respondent's Memorandum of Law ("Resp. Mem.") (Dkt. #11), petitioner's Amendment to Petition ("Am. Pet.") (Dkt. #22), respondent's supplemental Memorandum of Law ("Resp. Supp. Mem.") (Dkt. #25) and respondent's Supplementary Affidavit in Answer to an Amended Petition for a Writ of Habeas Corpus ("Resp. Supp. Aff.") (Dkt. #31).

Malcolm and Raymond Sharp; beneath the lieutenants were the soldiers or enforcers, including Justin Daniels and David Green, Jr.

PNC operated primarily in the City of Poughkeepsie, New York. PNC's members engaged in a pattern of criminal activity, including buying and selling narcotics and firearms, robbery, burglary, assault and murder. All PNC members were required to make money for PNC ("put in work") by selling narcotics or robbing drug dealers of their goods, cash or assets. The monies made from the sale of narcotics and firearms and commission of robberies was used for three purposes: to buy additional narcotics and firearms for future sale or use; to support the lifestyle of its members (including rent and travel); and to invest in the rap music industry with a goal of legitimizing a portion of the criminal enterprise.

B. Pretrial Proceedings

On or about February 6, 2007, petitioner filed an Omnibus Motion seeking various forms of relief, including severance of his trial from that of his co-defendants. See Resp. Aff., Exh. 4, at 5, 14-15 (unpaginated in original).[3] Petitioner argued severance was warranted because (1) each defendant may attempt to "point the finger" at a co-defendant, creating irreconcilable defenses and a significant risk that the jury would infer petitioner's guilt from the fact that he was mentioned more prominently in the pattern acts than some of his co-defendants, (2) the People were expected to offer "rap" lyrics as part of their proof of the existence of a criminal enterprise, in violation of Crawford v. Washington, 541 U.S. 36 (2004), and (3) "[t]he evidence the prosecution has divulged is rife with conversation by one defendant concerning the criminal culpability of another" which severely prejudices the non-speaking co-defendant. Id. at 15. By

---

[3] Hereinafter, all citations to "Exh. ___" refer to exhibits attached to respondent's Affidavit in Answer to the initial petition.

Decision and Order dated April 11, 2007, the County Court (Hayes, J.) ruled on the bulk of

petitioner's motion, but held the decision as to severance in abeyance pending consideration of

"the motion of the other defendants for severance, suppression of eavesdropping evidence and

other factors pertinent to the issue of severance." Exh. 6 at 5.

Between April 27, 2007 and May 24, 2007, co-defendants Dwayne Malcolm, Raymond

Sharp, Justin Daniels and David Green pled guilty to various counts in the indictment.  Thus, of

the original six co-defendants charged with enterprise corruption, only two remained:  petitioner

and Avery Green.  By Decision and Order dated June 20, 2007, the County Court (Hayes, J.)

denied petitioner's motion for severance on the ground that petitioner failed to demonstrate "that

the core of his defense is in irreconcilable conflict with that of his co-defendant nor has he made

a showing that there is significant danger that such a perceived conflict would lead the jury to

infer [petitioner's] guilt."  Exh. 7, at 7.  In so holding, the County Court specifically found (1) no

evidence that defendants gave statements that were diametrically opposed or inculpated each

other and (2) any statements made by petitioner or Green during the course of the alleged

criminal transactions were "res gestae" and did not create an issue under <u>Bruton v. United States</u>,

391 U.S. 123 (1968).  <u>Id.</u>

On or about July 13, 2007, petitioner's co-defendant moved to preclude two videos on

the ground they were prejudicial and not probative of any material issue in the case:

> The two (2) videos purport to show the defendant [Avery Green], in the first one,
> driving in an automobile and talking about his group of friends (unnamed in the
> video) and how, if anyone gives them trouble, he will "kill" them, and, in the
> second, as a background member of, presumably, a "rap" group singing an
> unintelligible song which the prosecution claims demonstrates the membership
> hierarchy of the alleged criminal enterprise, Partners N' Crime (PNC).

Exh. 8, ¶¶ 3-4.[4]  The prosecution responded, *inter alia*, (1) the first video constituted "direct proof of the existence of the criminal enterprise" and (2) the "rap" in the second video "set forth the method and means by which the enterprise operates" and "is directly relevant in establishing the existence of the criminal enterprise and to show how they were operating." Exh. 10, at 2-4. By Decision and Order dated September 14, 2007, the County Court (Hayes, J.) denied Green's motion to preclude the first video (Green driving and talking) on the grounds that it (1) "bears directly on the crime of Enterprise Corruption, a necessary element of which is the defendant's knowledge of the existence of the criminal enterprise and the nature of its activities" and (2) its direct probative value outweighed any possible prejudicial effect.  Exh. 11, at 2-4.  The County Court declined to rule as to the second video (the "rap" group) and referred that decision to the trial judge.  Id. at 2.

At trial, upon a foundation laid by Detective Alston's testimony on direct examination, the People moved both videos contained on the Prince of the City DVD into evidence, without objection.  See Resp. Supp. Aff., Exh. C, at 2929-2937.[5]  Later in the trial, prior to the testimony of prosecution witness Detective Terrence Dwyer, the People marked three exhibits: (1) People's Exhibit 104D, a "presentation disk" used at the pretrial hearings, consisting of both videos contained on the Prince of the City DVD; (2) People's Exhibit 357, a transcript of the first video on Exhibit 104D (Avery Green driving and talking); and (3) People's Exhibit 358, a transcript of

---

[4]  Exhibit 9 is a DVD encompassing both videos (hereinafter referred to as "the Prince of the City DVD"), filed as a supplemental exhibit pursuant to my Order dated January 25, 2012 (Dkt. #9).  The Prince of the City DVD contains three video segments: segments one and three are identical (Avery Green driving and talking); segment two is the "rap" video.  See Exh. 9.

[5]  The two videos were admitted as part of People's Exhibit 292, a DVD which also contained additional video segments unrelated to any issue presented for habeas review.

the second video on Exhibit 104D (the "rap" video).  See Resp. Supp. Aff., Exh. D, at 3930-31.

After a brief discussion, all three exhibits were admitted into evidence without objection.  See id.

at 3932.[6]  See also Resp. Supp. Aff. Exh. A (transcript of video of Avery Green driving and

talking) and Exh. B (transcript of the "rap" video).

C.  Direct Appeal

    Petitioner (by and through counsel) timely appealed his conviction to the Appellate

Division, Second Department on the following grounds:  (1) the trial court's admission into

evidence of the Prince of the City DVD violated petitioner's Sixth Amendment right to confront

witnesses; (2) the trial court erred in admitting evidence of an anonymous threat to witness

David Stokes under the consciousness of guilt exception to the hearsay rule; (3) the trial court

improperly admitted Dwayne Malcolm's hearsay testimony under the co-conspirator exception

to the hearsay rule; (4) petitioner was denied a fair trial because the trial court allowed six

witnesses to testify–without foundation–that petitioner was a lieutenant in PNC; (5) petitioner's

conviction of enterprise corruption was against the weight of the evidence and was not supported

by sufficient evidence; (6) the County Court erred in denying petitioner's motion for severance

of the trial; (7) petitioner's convictions related to the March 24, 2006 drug sale, the gun sale and

the burglary were against the weight of the evidence; (8) the special verdict sheet was improper;

and (9) petitioner's sentence was excessive.  See Exh. 14, at 58-74.  By Decision and Order

dated September 14, 2010, the Second Department affirmed petitioner's judgment of conviction.

People v. Anderson, 76 A.D.3d 980, 908 N.Y.S.2d 409 (2d Dep't 2010).  Petitioner, by and

through counsel, timely submitted an application for leave to appeal to the New York Court of

---

[6]  Petitioner's counsel stated he had no objection and "thought it was a stipulation."
Resp. Supp. Aff., Exh. D, at 3932.

Appeals, wherein he sought review of all of the claims raised in his appellate brief.  See Exh. 18. The Court of Appeals denied petitioner leave to appeal on November 22, 2010.  People v. Anderson, 15 N.Y.3d 918, 939 N.E.2d 811, 913 N.Y.S.2d 645 (2010).  Petitioner did not seek a writ of *certiorari* to the United States Supreme Court.

D.  The Instant Petition and Application for Stay of Proceedings

Petitioner timely[7] filed the instant Petition for a Writ of Habeas Corpus on or about October 20, 2011[8] in the Northern District of New York (Dkt. #1); the Petition was transferred to the Southern District of New York on November 16, 2011 (Dkt. #2).  The Petition seeks habeas review of the following claims: (1) the trial court's admission into evidence of the Prince of the City DVD violated petitioner's Sixth Amendment right to confront witnesses; and (2) the trial court erred in denying petitioner's motion to sever his trial from that of his co-defendant, Avery Green.

On or about February 14, 2012, petitioner requested a stay of the proceedings because he intended to file a motion pursuant to New York Criminal Procedure Law § 440.10 ("CPL 440.10 motion") to vacate his conviction based upon a witness's recantation of his trial testimony (Dkt. #13).  By Order entered March 29, 2012 (Dkt. #16), the undersigned (1) construed petitioner's application to encompass a motion to amend the petition to add this new claim, (2) granted petitioner's motion to amend, (3) granted petitioner's request for a stay and (4) directed petitioner to file his CPL 440.10 motion within thirty days and, within thirty days of the

_____

[7]  See 28 U.S.C. § 2244(d)(1).

[8]  The date on which petitioner placed the instant Petition in the prison mailing system. See Noble v. Kelly, 246 F.3d 93, 97 (2d Cir. 2001) (extending the "mailbox rule," Houston v. Lack, 487 U.S. 266 (1988), to *pro se* petitions for habeas relief).

-7-

resolution of that motion, to move to lift the stay and reopen this case.

The County Court initially received petitioner's CPL 440.10 motion on April 17, 2012. See Resp. Supp. Mem., Exh. 1.  By letter dated May 10, 2012 (Dkt. #17), petitioner notified this Court that the County Court had returned his CPL 440.10 motion for failure to properly serve it upon the Dutchess County District Attorney's Office, and sought this Court's assistance in effecting service.  By letter dated May 29, 2012 (Dkt. #18), this Court's Pro Se Office instructed petitioner to re-submit his CPL 440.10 motion to the County Court with an Affidavit of Service. Petitioner did so; respondent filed its Affirmation in Answer on or about July 23, 2012.  See Resp. Supp. Mem., Exh. 3.  By Decision and Order dated February 19, 2013, the County Court (Greller, J.) denied petitioner's motion in its entirety.  See Resp. Supp. Mem., Exh. 5.  Petitioner sought leave to appeal the denial of his CPL 440.10 motion to the Second Department; by Decision and Order dated August 26, 2013, the Appellate Division denied petitioner's leave application.  See Resp. Supp. Mem., Exh. 7.

On or about September 18, 2013, petitioner filed a motion to lift the stay of proceedings (Dkt. #20).  By Order entered October 23, 2013 (Dkt. #21), the undersigned granted petitioner's motion and directed him to file an amended petition, incorporating his new claim, within thirty days.  On or about November 8, 2013, petitioner filed a supplemental petition (Dkt. #22) which added a due process/denial of fair trial claim based upon Leon Jackson's recantation of his trial testimony.  Thus, petitioner presents three claims for habeas review:  (1) the trial court's admission into evidence of the Prince of the City DVD violated petitioner's Sixth Amendment right to confront witnesses; (2) the trial court erred in denying petitioner's motion to sever his trial from that of his co-defendant, Avery Green; and (3) petitioner was deprived of due process and a fair trial because the state courts refused to grant him a new trial based on Leon Jackson's

-8-

recantation.

### III.  APPLICABLE LAW

"Habeas review is an extraordinary remedy."  <u>Bousley v. United States</u>, 523 U.S. 614,

621 (1998) (<u>citing</u> <u>Reed v. Farley</u>, 512 U.S. 339, 354 (1994)).  Before a federal district court may

review the merits of a state criminal judgment in a habeas corpus action, the court must first

determine whether the petitioner has complied with the procedural requirements set forth in 28

U.S.C. §§ 2244 and 2254.  If there has been procedural compliance with these statutes, the court

must then determine the appropriate standard of review applicable to the petitioner's claim(s) in

accordance with  § 2254(d).  The procedural and substantive standards applicable to habeas

review, which were substantially modified by the Anti-Terrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), are summarized below.

A.  <u>Timeliness</u>

The AEDPA established a one-year statute of limitations for the filing of a habeas corpus

petition seeking relief from a state court conviction.  <u>See</u> 28 U.S.C. § 2244(d)(1).  The one-year

limitation period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or
> the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in
> violation of the Constitution or laws of the United States is removed, if the applicant was
> prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the
> Supreme Court, if the right has been newly recognized by the Supreme Court and made
> retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have
> been discovered through the exercise of due diligence.

<u>Id.</u>

The AEDPA's statute of limitations is tolled during the pendency of a properly filed

application for state post-conviction relief, or other collateral review, of a claim raised in the petition.  See id. § 2244(d)(2).  The one-year limitation period is also subject to equitable tolling, which is warranted when a petitioner has shown "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing."  Holland v. Florida, 560 U.S. 631, 649 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)).  "The term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period."  Harper v. Ercole, 648 F.3d 132, 137 (2d Cir. 2011).  "To secure equitable tolling, it is not enough for a party to show that he experienced extraordinary circumstances.  He must further demonstrate that those circumstances caused him to miss the original filing deadline."  Id.  Additionally, "[c]onsistent with the maxim that equity aids the vigilant, a petitioner seeking equitable tolling of AEDPA's limitations period must demonstrate that he acted with reasonable diligence throughout the period he seeks to toll."  Id. at 138 (internal quotation marks and citations omitted); see also Valverde v. Stinson, 224 F.3d 129, 134 (2d Cir. 2000) (A petitioner seeking equitable tolling must "demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances.").

B.  Procedural Default

      Federal habeas corpus review of a state court's denial of a state prisoner's federal constitutional claim is barred if the state court's decision rests on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional violation, or that he is actually

innocent.  See Bousley, 523 U.S. at 622; Coleman v. Thompson, 501 U.S. 722, 750 (1991).  See also Lee v. Kemna, 534 U.S. 362, 375 (2002); Dunham v. Travis, 313 F.3d 724, 729 (2d Cir. 2002).  A procedural ground is "independent" if "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar."  See Harris, 489 U.S. at 263 (internal quotation marks omitted).  A procedural bar is "adequate" if it is "based on a rule that is firmly established and regularly followed by the state in question." Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006) (internal quotation and citation omitted).

In certain limited circumstances, however, "even firmly established and regularly followed state rules will not foreclose review of a federal claim if the application of the rule in a particular case is 'exorbitant.'"  See Garvey v. Duncan, 485 F.3d 709, 713-14 (2d Cir. 2007) (citing Lee, 534 U.S. at 376).  To this end, the Second Circuit has set forth the following "guideposts" for evaluating the adequacy of the state procedural bar in the context of "the specific circumstances presented in the case, an inquiry that includes an evaluation of the asserted state interest in applying the procedural rule in such circumstances":

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir. 2003) (quoting Lee, 534 U.S. at 381-85).

C.  Exhaustion

A federal court may not grant habeas relief unless the petitioner has first exhausted his claims in state court.  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see 28 U.S.C. § 2254(b)(1) ("[a]n application for a writ of habeas corpus on behalf of a person in custody

pursuant to the judgment of a State court shall not be granted unless it appears that – (A) the

applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an

absence of available corrective process; or (ii) circumstances exist that render such process

ineffective to protect the rights of the applicant"); id. § 2254(c) (the petitioner "shall not be

deemed to have exhausted the remedies available in the courts of the State . . . if he has the right

under the law of the State to raise, by any available procedure, the question presented"). The

exhaustion requirement promotes interests in comity and federalism by demanding that state

courts have the first opportunity to decide a petitioner's claims. Rose v. Lundy, 455 U.S. 509,

518-19 (1982).

To exhaust a federal claim, the petitioner must have "fairly present[ed] his claim in each

appropriate state court (including a state supreme court with powers of discretionary review),

thereby alerting that court to the federal nature of the claim," and thus "giving the State the

opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Baldwin

v. Reese, 541 U.S. 27, 29 (2004) (internal quotation marks and citations omitted). "Because

non-constitutional claims are not cognizable in federal habeas corpus proceedings, a habeas

petition must put state courts on notice that they are to decide federal constitutional claims."

Petrucelli v. Coombe, 735 F.2d 684, 687 (2d Cir. 1984) (citing Smith v. Phillips, 455 U.S. 209,

221 (1982)). Such notice requires that the petitioner "apprise the highest state court of both the

factual and legal premises of the federal claims ultimately asserted in the habeas petition."

Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (internal citation omitted). In doing so, a

petitioner need not cite chapter and verse of the Constitution; there are a number of other ways in

which a petitioner may fairly apprise the state court of the constitutional nature of his claim,

including: "a) reliance on pertinent federal cases employing constitutional analysis, b) reliance

-12-

on state cases employing constitutional analysis in like fact situations, c) assertion of the claim in

terms so particular as to call to mind a specific right protected by the Constitution, and d)

allegation of a pattern of facts that is well within the mainstream of constitutional litigation."

Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011).  A habeas petitioner who fails to meet a

state's requirements to exhaust a claim will be barred from asserting that claim in federal court.

Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

> However, "[f]or exhaustion purposes, a federal habeas court need not require that a

federal claim be presented to a state court if it is clear that the state court would hold the claim

procedurally barred."  Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997) (internal quotation

omitted).  "In such a case, a petitioner no longer has 'remedies available in the courts of the

State' within the meaning of 28 U.S.C. § 2254(b)."  Grey v. Hoke, 933 F.2d 117, 120 (2d Cir.

1991).  Such a procedurally barred claim may be deemed exhausted by a federal habeas court.

See, e.g., Reyes, 118 F.3d at 139.  However, absent a showing of either "cause for the procedural

default and prejudice attributable thereto," Harris v. Reed, 489 U.S. 255, 262 (1989), or "actual

innocence," Schlup v. Delo, 513 U.S. 298 (1995), the petitioner's claim will remain

unreviewable by a federal court.

> When confronted with a "mixed" petition containing both exhausted and unexhausted

claims, a federal court has the following options: (1) it may stay the proceedings and hold the

petition in abeyance in order to permit the petitioner to return to state court and exhaust the

unexhausted claim(s); (2) it may permit the petitioner to amend the petition and excise any

unexhausted claim; (3) it may dismiss without prejudice the entire petition; or (4) it may review

and deny a mixed petition containing both exhausted and unexhausted claims, if those

unexhausted claims are "plainly meritless."  See 28 U.S.C. § 2254(b)(2); Rhines v. Weber, 544

U.S. 269, 277-78 (2005); Zarvela v. Artuz, 254 F.3d 374, 378-82 (2d Cir. 2001); Reyes v.

Morrissey, No. 07 Civ. 2539, 2010 WL 2034531, at *9 (S.D.N.Y. Apr. 21, 2010) (Report and

Recommendation), *adopted by* 2010 WL 2034527 (S.D.N.Y. May 19, 2010).[9]

D.  Standard of Review

"[I]t is not the province of a federal habeas court to reexamine state-court determinations

on state-law questions.  In conducting habeas review, a federal court is limited to deciding

whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v.

McGuire, 502 U.S. 62, 68 (1991).  See 28 U.S.C. § 2254(a).  When reviewing petitions filed

subsequent to the AEDPA's effective date, a federal court may not grant habeas relief unless the

petitioner establishes that the state court's decision "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

United States" or "was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (d)(2).  The AEDPA

deferential standard of review will be triggered if the petitioner's claim "was adjudicated on the

merits in State court proceedings."  28 U.S.C. § 2254(d); see Bell v. Miller, 500 F.3d 149, 154-

55 (2d Cir. 2007).  "For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state

prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2)

reduces its disposition to judgment."  Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001).

A state court's decision is "contrary to" clearly established Federal law if (1) "the state

court applies a rule that contradicts the governing law set forth [by the Supreme Court of the

United States]" or (2) "the state court confronts a set of facts that are materially indistinguishable

---

[9]  Copies of all unpublished cases available only in electronic form cited herein have been
mailed to petitioner.  See Lebron v. Sanders, 557 F.3d 76, 78 (2d Cir. 2009).

from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [Supreme Court] decisions. And an 'unreasonable application of' those holdings must be objectively unreasonable, not merely wrong; even 'clear error' will not suffice." White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). "The critical point is that relief is available under § 2254(d)(1)'s unreasonable application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." Id. at 1706-07 (quoting Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011)) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

Finally, under the AEDPA, the factual findings of state courts are presumed to be correct. See 28 U.S.C. §2254(e)(1); see also Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997). The petitioner must rebut this presumption by "clear and convincing evidence." 28 U.S.C. §2254(e)(1).

## IV. ANALYSIS

A. First Habeas Claim: Confrontation Clause

As his first claim for habeas relief, petitioner contends that the trial court's admission of the Prince of the City DVD violated his Sixth Amendment right to confront witnesses under Bruton, 391 U.S. 123, and Crawford, 541 U.S. 36. Petitioner exhausted this claim on direct appeal; the Appellate Division held:

-15-

> The defendant's contention that the admission of a "rap video" containing statements made by nontestifying codefendant Avery Green violated his right of confrontation under Crawford v Washington and Bruton v United States is without merit as the statements were not testimonial in nature and did not implicate the defendant.

People v. Anderson, 76 A.D.3d 980, 981-82, 908 N.Y.S.2d 409 (citations omitted).  The

Appellate Division's written decision denying the claim on its merits represents the last-reasoned

state court decision to address petitioner's Sixth Amendment challenge to admission of the

Prince of the City DVD.  Accordingly, on habeas review, I must apply the deferential AEDPA

review standard in evaluating petitioner's Sixth Amendment claim.  See Sellan, 261 F.3d at 312.

"In *Bruton*, the Supreme Court held that the Confrontation Clause of the Sixth

Amendment prohibits the introduction of the confession of a non-testifying codefendant that

implicates the defendant in a crime."  United States v. Lung Fong Chen, 393 F.3d 139, 147-48

(2d Cir. 2004) (citing Bruton, 391 U.S. 123, 126).  The Court limited *Bruton*'s reach in

Richardson v. Marsh, 481 U.S. 200 (1987) "by holding that when a confession is redacted so that

it does not facially incriminate the defendant, its admission with a proper limiting instruction

does not violate the Confrontation Clause."  Lung Fong Chen, 393 F.3d at 148.  See Richardson,

481 U.S. at 206-09 (no *Bruton* error where "the confession was not incriminating on its face, and

became so only when linked with evidence introduced later at trial").  *Cf.* Gray v. Maryland, 523

U.S. 185, 196 (1998) (*Bruton* applies to "statements that, despite redaction, obviously refer

directly to someone, often obviously to [the defendant], and which involve inferences that a jury

ordinarily could make immediately, even were the confession the very first item introduced at

trial.").  "Following *Richardson*, [the Second Circuit] has consistently declined to identify

*Bruton* error where statements thus inculpate co-defendants only when placed in context with

other testimony."  United States v. Taylor, 752 F.3d 254, 269 (2d Cir. 2014).

-16-

In *Crawford*, the Supreme Court held that prior testimonial statements of witnesses who do not testify at trial are admissible against a defendant "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine" the declarant. Crawford v. Washington, 541 U.S. at 59.  The Court declined "to spell out a comprehensive definition of 'testimonial,'" but held "it applies at a minimum" to prior testimony before a grand jury, at a preliminary hearing, during a previous trial "and to police interrogations." Id. at 68. These examples reflect the Court's observation that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. at 51.  "Thus, the types of statements cited by the Court as testimonial share certain characteristics; all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings." United States v. Saget, 377 F.3d 223, 228 (2d Cir. 2004).  In other words, "*Crawford* at least suggests" that the question of whether a statement is testimonial turns on "the declarant's awareness or expectation that his or her statements may later be used at a trial." Id. (holding declarant's statements to a confidential informant were admissible against defendant–and  not "testimonial" under *Crawford*–because declarant did not know the confidential informant's "true status").

I have carefully reviewed the Prince of the City DVD (Exh. 9) and the corresponding transcripts (Resp. Supp. Aff. Exhs. A, B).  There is no statement (or image) in either video which could reasonably be construed as facially incriminating petitioner. Thus, a jury relying solely upon a viewing of the Prince of the City DVD could not have reasonably inferred petitioner's involvement in the criminal enterprise absent additional evidence linking him to it.  I conclude,

therefore, that the trial court's admission of the Prince of the City DVD was not *Bruton* error. Moreover, both videos reflect what appears to be casual, informal, peer-to-peer communication; there is no indication that the declarant in either video had an awareness or expectation that his statements might, at some future date, be used at a trial. Thus, none of the statements in either video could reasonably be construed as "testimonial." Further, because the statements at issue implicate petitioner only in the context of other evidence, they cannot be deemed to have been admitted *against* petitioner. See Lung Fong Chen, 393 F.3d at 150 ("The same attenuation of [declarant's] statements from [petitioner's] guilt that prevents *Bruton* error also serves to prevent *Crawford* error."). I conclude, therefore, that the trial court's admission of the Prince of the City DVD was not *Crawford* error.

In sum, the Second Department's denial of petitioner's Sixth Amendment claim was neither contrary to, nor an unreasonable application of, federal law. Accordingly, I conclude and respectfully recommend that petitioner's first claim provides no basis for habeas relief.

B. Second Habeas Claim: Trial Court's Refusal to Sever Petitioner's Trial

As his second claim for habeas relief, petitioner argues that he was deprived of a fair trial because the trial court refused to sever his trial from that of his co-defendant. Petitioner exhausted this claim on direct appeal; the Appellate Division summarily denied relief. People v. Anderson, 76 A.D.3d 980, 982, 908 N.Y.S.2d 409 (holding "[t]he defendant's remaining contentions are without merit"). The Appellate Division's "summary disposition constitutes a disposition 'on the merits.'" Hawthorne v. Schneiderman, 695 F.3d 192, 196 (2d Cir. 2012) (citing Harrington v. Richter, 131 S. Ct. at 784-85). Because the Appellate Division's written decision represents the last-reasoned state court decision to address petitioner's severance claim,

I must review that claim in accordance with the deferential AEDPA review standard. See id.

The Supreme Court "has never determined when severance is constitutionally mandated or how a federal habeas court should review a state court's denial of a severance motion." Williams v. Moscicki, No. 10-CV-5918, 2014 WL 1277400, at *8 (E.D.N.Y. Mar. 27, 2014) (quotation and citations omitted). The Second Circuit has held, however, that a petitioner seeking habeas relief based upon the denial of a severance motion must, at a minimum, demonstrate "that he was so severely prejudiced by the joinder as to have been denied a fair trial." Grant v. Hoke, 921 F.2d 28, 31 (2d Cir. 1990) (quotation marks and citations omitted).

Here, petitioner argues that, because the trial court's admission of the Prince of the City DVD violated his Sixth Amendment right to confront witnesses under *Bruton* and *Crawford*, he was severely prejudiced and, therefore, the trial court should have granted his motion for severance. As discussed above, however, the trial court's admission of the Prince of the City DVD did not violate either *Bruton* or *Crawford*. Petitioner has advanced no other factual basis in support of his argument that he was denied a fair trial.[10] Thus, there is no basis to conclude that the Appellate Division's rejection of petitioner's severance claim was either contrary to, or an unreasonable application of, federal law. Accordingly, I conclude and respectfully recommend that petitioner is not entitled to habeas relief on his second claim.

C. Leon Jackson's Recantation

Petitioner asserts, as his third ground for habeas relief, that he was deprived of due process and a fair trial because the state courts refused to grant him a new trial based on

---

[10] On direct appeal, petitioner also argued that the trial court erred in refusing to sever the enterprise corruption count from the substantive drug, gun and burglary courts, resulting in prejudicial spillover. See Exh. 14, at 68. He has not included this claim in his habeas petition.

confidential informant Leon Jackson's recantation of his trial testimony.[11]  Specifically,

petitioner argues that his drug convictions were based on Jackson's perjured testimony and,

because there was no other evidence linking petitioner to the drug sales, this "new evidence"

(Jackson's recantation) would most likely change the outcome of the trial.  See Am. Pet., Exh. B

(Memorandum of Law), at 10-12.  Petitioner exhausted this claim in his CPL 440.10 motion to

the County Court; the County Court held:

> A review of the trial testimony reveals a significant amount of evidence
> which connects the defendant to each of the drug sales that the confidential
> informant has most recently attempted to recant his involvement in.
>     As such, the Court finds the recantation unreliable and incredible and
> therefore denies the defendant's application.

Resp. Supp. Mem., Exh. 5, at 4.  The County Court's written decision denying the claim on its

merits represents the last-reasoned state court decision to address petitioner's motion for a new

trial based on Jackson's recantation.  Accordingly, on habeas review, I must apply the deferential

AEDPA review standard in evaluating petitioner's due process claim.  See Sellan, 261 F.3d at

312.

"If the prosecution intentionally obtains a conviction through perjured testimony, due

process is violated."  Heron v. Coughlin, 146 F.App'x 516, 517 (2d Cir. 2005).  The Second

Circuit "has also held that sufficiently material perjury may establish an error of constitutional

---

[11]  In an Affidavit dated January 19, 2012, Leon Jackson stated inter alia:
> On or about September 2008, under pressure, influence, coercion, and
> abuse of power of the police toppled [sic] with the Dutchess County District
> Attorney Office's threats as well, I falsely testified against Ykim Anderson.  I
> took the stand and testified that I received drugs from Ykim Anderson for
> approximately $100.00.  However, my testimony was not true, it was coerced
> because I never, personally received any drug whatsoever from Ykim Anderson.
> I fabricated a story that was not true under threats and coercion of the Police and
> the district attorney office.

Resp. Supp. Mem., Exh. 1.

scope even without prosecutorial knowledge." Id. Here, the County Court found Jackson's *recantation* "unreliable and incredible" and, thus, determined that Jackson's trial testimony was *not* perjured.  Pursuant to the deferential AEDPA review standard, I must determine whether the state court's findings were unreasonable in light of the evidence presented, 28 U.S.C. § 2254(d)(2), or whether the presumption that they are correct was rebutted by "clear and convincing" evidence, 28 U.S.C. § 2254(e)(1).  See Channer v. Brooks, 320 F.3d 188, 195 (2d Cir. 2003).

In order to assess the reasonableness of the County Court's findings, I must analyze them in the context of the relevant trial testimony.  At trial, Leon Jackson testified as follows:

On March 24, 2006, at approximately 9:15 p.m., Jackson met with Detective Hansut; Hansut asked Jackson to "make a buy" and took him to meet with Officer McCarthy.  T. 3779. The officers searched Jackson for contraband and currency, found none, put a wire on Jackson, tested it to make sure it worked and gave him a hundred dollars "to make a phone call to buy drugs."  T. 3779-80.  Jackson called Anderson ("B-James") using a phone number Anderson previously provided to him.  T. 3780-81, 3811.  Jackson spoke to Anderson, and told him he "had a buck" (a hundred dollars); Anderson told Jackson to meet him on Harrison Street.  T. 3781-82.  Detective Hansut dropped Jackson off at Harrison Street and he proceeded to 12 Harrison Street (where he was supposed to meet Anderson); Anderson was not there, but Jackson met with Avery Green.  T. 3782.  Jackson asked Green where Anderson was; Green said "I got that."  T. 3783.  Jackson gave Green the hundred dollars; Green gave Jackson a plastic bag filled with white chunky rocks.  Id.  Jackson left and, as he walked away, he spoke into the microphone to McCarthy and said "it wasn't [Anderson], it was Avery."  T. 3784.  Jackson met Hansut on Rose Street and handed him the "stuff."  Id.  Hansut searched Jackson and found no

money or contraband.  Id.

On March 27, 2006, at approximately 3:15 p.m., Jackson met with Hansut and another officer ("Jimmy"); Hansut asked Jackson to make another buy.  T. 3786.  The officers searched Jackson for drugs and/or money and found none.  T. 3787.  They outfitted Jackson with a wire; Jackson called Anderson at the same number he used on March 24th.  Id.  Jackson told Anderson he had "a buck"; Anderson told Jackson to meet him on Morgan Avenue.  T. 3787-89.  As Jackson walked down Mansion Avenue, a white Kia pulled up on the corner of Mansion and a side street.  T. 3789.  Anderson was driving; Malcolm was in the passenger seat.  T. 3789-90.  Jackson walked to the passenger side of the Kia and handed Anderson "the hundred"; Anderson handed back a clear plastic "bag full of rocks, white chunky rock."  T. 3789-91.  Jackson returned to Hansut and gave the bag to him.  T. 3791.  Hansut searched Jackson and found no other drugs or money.  Id.

The testimony of other witnesses who testified about the March 2006 transactions dovetailed with Jackson's account:

*1. NRU Officer Sean McCarthy's Testimony*

On March 24, 2006, Detective Paul Hansut sought assistance from Neighborhood Recovery Unit ("NRU") Officer Sean McCarthy to provide the money, equipment and surveillance team for confidential informant Leon Jackson's controlled buy of narcotics from Ykim Anderson.  T. 2611, 2686.[12]  McCarthy and Hansut met with Jackson in a secure location; Hansut searched him for contraband and currency and found none.  T. 2612.  McCarthy equipped Jackson with a listening device which would allow the officers to monitor and record

---

[12] Numbers preceded by "T." refer to pages from the trial transcript, included in Exhibit 3 attached to respondent's supplemental Memorandum of Law.

Jackson's conversation with Anderson.  Id.  McCarthy watched Jackson dial Anderson's cell phone number; Jackson spoke with a male on the other end of the phone.  T. 2613.  As a result of that phone call, McCarthy advised the surveillance team that the meeting was set up near Mansion and Winnikee.  T. 2614.  McCarthy provided Jackson with one hundred dollars in pre-recorded U.S. currency; Hansut and Jackson left in Hansut's vehicle, heading toward another secure location closer to the meet point.  T. 2614-15.  McCarthy, in a separate vehicle, also left for the area of Mansion and Winnikee.  T. 2615.  On the way, he received a phone call from Hansut; as a result of that conversation, McCarthy advised the surveillance team that the meet location had changed to the area of 12 Harrison Street.  T. 2615-16.  McCarthy drove to a location closer to Harrison Street, where he was able to monitor and record most of Jackson's conversation.  T. 2616-23.  He ended the recording after Hansut advised him that Jackson had returned.  T. 2623.[13]  McCarthy met Hansut and Jackson at a secure location, where Hansut gave McCarthy an evidence bag containing a clear plastic bag which, in turn, contained a white chunky substance and some loose pieces of "white chunk substance."  Id.  Hansut searched Jackson and found no contraband or currency.  Id.  A field test of the white chunky substance was positive for the presence of crack cocaine.  T. 2627.

 2. *Detective Paul Hansut's Testimony*

 On March 24, 2006, at approximately 9:15 p.m., Detective Hansut was working with NRU Officer McCarthy to set up a controlled narcotics buy from the subject of their investigation, Ykim Anderson, using confidential informant Leon Jackson to make the purchase. T. 2685-86.  Hansut picked up Jackson at his residence and drove him to a location in the City of

---

[13] The recording (which included Jackson's March 24th phone call to Anderson) was admitted into evidence without objection.  T. 2618-21.

Poughkeepsie, where they met Officer McCarthy.  T. 2687.  The officers searched Jackson and verified he was free of any contraband or currency.  Id.  Jackson made a phone call to the target; McCarthy gave Jackson pre-recorded buy money and Hansut drove him in an unmarked police car to the meet location (Mansion and Winnikee).  T. 2688.  On the way, Jackson received a phone call and, as a result, Hansut dropped Jackson off at the corner of Smith and Harrison Street.  T. 2688-89.  Jackson exited the vehicle and began walking east on Harrison Street toward 12 Harrison Street.  T. 2689.  Hansut watched Jackson turn the corner, waited a few moments, then drove up Harrison Street past number 12.  Id.  Hansut observed three to five black males on the porch of 12 Harrison Street and continued driving to the prearranged post-buy meet point at the end of Rose Street.  T. 2690.  Hansut waited there until Jackson arrived (approximately ten to fifteen minutes after Hansut dropped him off).  T. 2690-91.  Jackson got into the car and handed Hansut a small plastic bag containing a white rocky substance Hansut believed to be narcotics.  T. 2691.  Hansut again searched Jackson and verified he was free of any contraband or currency.  Id.

On March 27, 2006 at approximately 3:15 p.m., Hansut picked up Jackson, drove to a secured location and met with Dutchess County Drug Task Force Agent James Enkler.  T. 2692. Enkler searched Jackson and verified he was free of any currency or contraband.  T. 2692-93.  A phone call was made; Hansut drove Jackson to Mansion Street and dropped him off on Mansion Street near North Clinton.  T. 2693.  Hansut watched Jackson walk east on Mansion Street toward the area of Winnikee.  T. 2694.  Hansut drove to Smith; some time later, at that location, Jackson got back into Hansut's vehicle and handed him a clear plastic baggy containing a white rocky substance.  T. 2695.  Hansut observed a white Kia traveling west on Cottage Street.  T. 2695-96.  Hansut drove Jackson back to the original secure location, where they met Agent

Enkler.  T. 2596.  The drugs were turned over to Agent Enkler; Enkler again searched Jackson.
Id.

Approximately four hours later, while Hansut and FBI Agent Ausanio were conducting
surveillance near 700 Main Street, Hansut observed the white Kia (with at least three people
inside) pull into a parking lot.  T. 2697-98.  Avery Green exited the front passenger seat, walked
west on Main Street and entered 700 Main Street.  Id.  The Kia pulled out of the parking spot,
drove across the street and parked in the lot across from 700 Main Street.  T. 2698.  Ten or
fifteen minutes later, Green came out of 700 Main Street, walked across the street and got into
the Kia and it left the area.  Id.

### 3.  Agent James Enkler's Testimony

On March 27, 2006, at approximately 3:20 p.m., Agent Enkler met with Detective Hansut
and confidential informant Leon Jackson.  T. 2736-37.  Enkler searched Jackson and found no
contraband or currency, then equipped Jackson with a wire transmitter and gave him a hundred
dollars.  T. 2737-38.  Enkler connected his recording equipment to Jackson's cell phone and
dialed a number he believed belonged to Ykim Anderson. T. 2738-39.  Enkler listened to the
phone conversation, then advised other surveillance agents (who were stationed in the area of
Ykim Anderson's home) of what had transpired and where they needed to go.  T. 2739-40.
Jackson got in a vehicle with Detective Hansut; Enkler followed them toward Mansion Street.
T. 2740.  Enkler stayed in the area of Mansion and Smith while Hansut dropped Jackson off a
block away.  T. 2741.  Enkler observed Jackson get out of the car and head toward Smith Street.
Id.  He also observed a white Kia, driven by Ykim Anderson, heading down Mansion Street
towards Morgan Avenue.  T. 2741-42.  Enkler watched as Jackson met the Kia on Morgan
Avenue.  T. 2741.  As Enkler monitored the live transmission from Jackson's wire, he observed

Jackson walk up to the passenger side window and have a conversation with the driver.  Id.

Enkler saw some kind of hand-to-hand contact between Jackson and the driver; Jackson was

leaning in over the passenger and the driver had his body turned to face the passenger side.  T.

2743.  Enkler recorded a conversation between Jackson and Anderson.  T. 2749.[14]   Jackson

backed away from the vehicle and it left the area.  T. 2744.  Enkler could not identify the person

sitting in the front passenger seat, apart from observing that he was a black male.  Id.  Enkler

radioed Hansut to pick up Jackson, then drove back and met them at the meet location.  T. 2744-

45.  Enkler searched Jackson, found no contraband or currency, and removed the wire; Jackson

handed Enkler a clear plastic bag containing a white chunky substance.  T. 2745-46.  Enkler

performed a field test on the substance, which was positive for cocaine.  Id.

### 4.  Dwayne Malcolm's Testimony

On March 27, 2006, Dwayne Malcolm and Ykim Anderson were riding around in a white

Kia Malcolm had rented; Anderson was driving.  T. 3513-14, 3524.  Anderson got a call on his

cell phone, then asked Malcolm if he had any crack (also known as "work"); Malcolm said

"yeah, I got some bread for you" and they drove to Morgan Avenue.  T. 3515-16.  When they

got to Morgan, someone Malcolm knew only as "Baldy" or "Crackhead" was waiting for

Anderson.  Id.  Malcolm gave Anderson "the whole bag"; Anderson sold "Baldy" some crack for

ninety-five or a hundred dollars.  T. 3516.

In sum, there was substantial evidence adduced at trial which corroborated Jackson's trial

testimony.  I therefore conclude that the County Court's determination (that Leon Jackson's

recantation was unreliable and incredible) was reasonable in light of the evidence presented.  See

---

[14]  The recording (which included the March 27th phone call to Anderson) was admitted
into evidence without objection.  T. 2749-51.

28 U.S.C. § 2254(d)(2).  Moreover, petitioner has not proffered clear and convincing evidence

which rebuts the presumption of correctness accorded to the County Court's factual findings.

See 28 U.S.C. § 2254(e)(1).  Accordingly, I conclude and respectfully recommend that

petitioner's third claim provides no basis for habeas relief.

## IV. CONCLUSION

For the reasons set forth above, I conclude—and respectfully recommend that Your

Honor should conclude—that the instant petition for a writ of habeas corpus should be denied in

its entirety.  Further, because reasonable jurists would not find it debatable that petitioner has

failed to demonstrate by a substantial showing that he was denied a constitutional right, I

recommend that no certificate of appealability be issued.  See 28 U.S.C. § 2253(c); Slack v.

McDaniel, 529 U.S. 473, 483–84 (2000).

Dated:   June 5, 2015                                       Respectfully Submitted,
         White Plains, New York

                                                            PAUL E. DAVISON, U.S.M.J.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days, plus an additional three (3) days, or a total

of seventeen (17) days, from service of this Report and Recommendation to serve and file

written objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections, if any, along with

any responses to the objections, shall be filed with the Clerk of the Court with extra copies

delivered to the chambers of the Hon. Nelson Stephen Román, at the Hon. Charles L. Brieant, Jr.

Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.  See Caidor v. Onondaga County, 517 F.3d 601, 604 (2d Cir. 2008).

Requests for extensions of time to file objections must be made to Judge Román.

A copy of this Report and Recommendation has been mailed to:

Ykim Anderson, 08A1738
Wende Correctional Facility
P.O. Box 1187
Alden, NY 14004